UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 19 C 6825 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| ANDREW SAUL, Commissioner | ) |
| of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Henry D. seeks to reverse the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. Because substantial evidence supports the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") determination, the Court affirms the ALJ's decision.

**BACKGROUND**

**I.  Procedural History**

Henry D. applied for DIB benefits on October 18, 2012[1] alleging a disability onset date of August 15, 2008. AR 156–57, 162. The Social Security Administration ("SSA") denied his application at both the initial and reconsideration stages of review in 2013. AR 156–61, 163–69. Henry D. requested a hearing at which he testified, represented by counsel, on January 23, 2015. AR 117, 126–55, 190–92. Henry D. became ill during this hearing and therefore, the ALJ continued the hearing on April 9. AR 45–47, 153–54. On May 22, the ALJ issued a written

---

[1] Henry D. applied for DIB twice before this date, but those applications are not at issue here. *See* AR 120–23.

decision finding that Henry D. was not disabled during the relevant time period and denying his disability application. AR 29–39. Henry D. sought review of this decision by the Appeals Council. AR 434–38. On January 20, 2017, the Appeals Council upheld the ALJ's May 2015 decision. AR 1–3.

Henry D. then filed a complaint for judicial review of the May 2015 decision with the court on March 22, 2017. AR 1163–66. On July 24, 2018, the court remanded the case to the SSA, finding (1) an evidentiary gap in the record due to the lack of medical opinions to support the ALJ's RFC determination and (2) that the ALJ provided legally insufficient support for her adverse credibility determination of Henry D.'s subjective complaints. AR 1182–91. On September 17, 2018, the Appeals Council remanded the case to the ALJ with instructions to "obtain medical expert evidence to assist in evaluating the [RFC]." AR 1194. On remand, a different ALJ held a hearing on May 15, 2019, at which an impartial medical expert, Dr. Gilberto Munoz, testified regarding Henry D.'s RFC. AR 1090–130. On June 17, this ALJ issued a written decision finding that Henry D. was not disabled and denying his disability application. AR 856–69. Henry D. did not seek review from the Appeals Council, making the ALJ's June 2019 decision final. *See* 20 C.F.R. § 404.984(a), (d); *Murphy v. Berryhill*, 727 F. App'x 202, 206 (7th Cir. 2018); AR 853–55. Henry D. now appeals this June 2019 decision, arguing that the ALJ committed reversible error in assessing his RFC.

## II.    Factual Background

Henry D. was born on October 15, 1968. AR 332. He attended four years of a five-year collegiate program but did not graduate. AR 127, 380. Prior to Henry D.'s alleged disability onset date of August 15, 2008, he worked in a variety of positions including as an activity coordinator at an adult daycare. AR 367. Most recently, from 1999 to 2003, Henry D. worked

as a service technician for copy machines, which required him to walk and stand for about two hours each throughout a working day. AR 367, 392. Henry D. reported that he has not worked since 2003 primarily because of chronic pain in his right foot. AR 126, 139, 380, 1111–12.

Henry D.'s date last insured ("DLI") was June 30, 2009. AR 119–20, 356, 858. To prove his DIB claim, he must show that he became disabled on or before his DLI. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). Therefore, the Court will primarily focus on the evidence between August 15, 2008 (alleged disability onset date) and June 30, 2009 (DLI). The Court may refer to evidence prior to the alleged disability onset date for context or to the extent that it may shed light on Henry D.'s conditions between August 15, 2008 and June 30, 2009 ("relevant time period").

A.  **Medical Evidence**

Henry D. has a history of pain in his right foot and ankle dating back to 2003. AR 556. Between 2003 and 2008, medical providers diagnosed Henry D. with complex regional pain syndrome ("CRPS"),[2] tarsal tunnel syndrome,[3] sinus tarsi syndrome,[4] capsulitis,[5] plantar

---

[2] CRPS "is a form of chronic pain that usually affects an arm or a leg. CRPS typically develops after an injury, a surgery, a stroke or a heart attack. The pain is out of proportion to the severity of the initial injury." *Complex Regional Pain Syndrome – Symptoms and Causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/symptoms-causes/syc-20371151 (last visited Apr. 19, 2021).

[3] Symptoms of tarsal tunnel syndrome "include shooting pain, numbness, [and a] tingling or burning sensation in the foot." *Tarsal Tunnel Syndrome*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/tarsal-tunnel-syndrome (last visited Apr. 19, 2021).

[4] Symptoms of sinus tarsi syndrome include localized pain between the ankle and heel bone "with a feeling of instability and aggravation by weight bearing activity." *Sinus Tarsi Syndrome*, Am. Acad. of Podiatric Sports Med., http://www.aapsm.org/sinus_tarsi_syndrome.html (last visited Apr. 19, 2021).

[5] Symptoms of capsulitis include pain and swelling in the ball of the foot. *Capsulitis of the Second Toe*, Am. Coll. of Foot & Ankle Surgeons, https://www.foothealthfacts.org/conditions/capsulitis-of-the-second-toe (last visited Apr. 19, 2021).

fasciitis,[6] arthritis,[7] and tendonitis[8] in his right foot and/or ankle and prescribed him with various treatments including surgery, injections, medication, taping, braces/casts, and physical therapy. AR 556–57, 655, 659, 662, 671, 673–74, 680. Henry D. had numerous surgeries on his right foot and ankle to alleviate pain prior to his alleged disability onset date. AR 556, 634, 881. However, as of August 2008, he still reported pain in his right foot to Dr. John F. Grady, a Doctor of Podiatric Medicine, who assessed him at that time with subtalar joint arthritis and CRPS. AR 653. On August 4, 2008, eleven days prior to the alleged onset date, Dr. Grady injected Henry D.'s right ankle with medication, which only provided him with relief for a couple of hours. AR 652–53.

After the alleged disability onset date, Henry D. continued to report pain in his right foot to Dr. Grady, who assessed him with sinus tarsi syndrome on September 8, 2008 and referred him to a rehabilitation specialist. AR 651. On November 3, Henry D. reported to the specialist, Dr. Raghuvansh Kumar, that he had been suffering from excruciating right foot and ankle pain for five years. AR 556. Dr. Kumar believed Henry D. had neuropathic pain syndrome of the right foot and ankle and ordered an MRI, EMG, and nerve conduction study to confirm his clinical impression. AR 556–57. On November 7, an MRI of Henry D.'s right ankle and foot

---

[6] Plantar fasciitis causes a "stabbing pain" in one's heel. *Plantar Fasciitis – Symptoms and Causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/symptoms-causes/syc-20354846 (last visited Apr. 19, 2021).

[7] Symptoms of arthritis include pain, stiffness, and swelling. *Osteoarthritis – Symptoms and Causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925 (last visited Apr. 19, 2021).

[8] Symptoms of tendonitis include pain, tenderness, and swelling. *Tendinitis – Symptoms and Causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tendinitis/symptoms-causes/syc-20378243 (last visited Apr. 19, 2021).

showed "[m]ild soft tissue swelling" in three toes but did not show evidence of sinus tarsi syndrome. AR 583.

On January 15, 2009, the EMG and nerve conduction study suggested that Henry D. had peripheral neuropathy[9] in his right foot. AR 590–91. On January 26, after reviewing the MRI, EMG, and nerve conduction results, Dr. Kumar reported, "At the present time, there is no significant thing that can be done for the pain management for this unfortunate young gentleman. Refer back to Dr. Grady for further evaluation and intervention whatever seems to be necessary." AR 534. At multiple visits during the relevant time period, primary care providers assessed Henry D. without noting any foot problems. *See* AR 507–14, 517–20, 537–38. However, on March 17, Dr. Sushma Raghavendra, one of Henry D.'s primary care providers, noted that he had pain and stiffness in his right foot, but did not note any swelling. AR 515–16. Dr. Raghavendra instructed Henry D. to follow-up with podiatry. AR 516.

On June 29, Henry D. visited Dr. Grady complaining of chronic and constant pain in his right foot. AR 650. Dr. Grady assessed him with sinus tarsi syndrome, capsulitis, and tarsal tunnel syndrome of the right foot. *Id.* Dr. Grady noted that Henry D. had "a lot of build up of fluid on the outside of the foot" and gave him an injection because those historically provided him with relief. *Id.* The injection gave Henry D. immediate relief and Dr. Grady instructed him to return in a month. *Id.* At this follow-up appointment, which occurred after the DLI, Henry D. reported to Dr. Grady that his foot was still "very painful" and that the injection he received at the prior visit only provided three hours of relief. AR 649. Dr. Grady assessed Henry D. with

---

[9] Symptoms of peripheral neuropathy include "sharp, jabbing, throbbing[,] or burning pain[,]" and numbness. *Peripheral Neuropathy – Symptoms and Causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Apr. 13, 2021).

5

tarsal tunnel syndrome due to the "radiating pain" in his big toe upon stimulation of the tibial nerve and prescribed him with pain medication. *Id.*

During the relevant time period, medical providers also diagnosed Henry D. with asthma, obesity, diabetes mellitus, prostate hyperplasia, hypertension, gastroesophageal reflux disease ("GERD"), and obstructive sleep apnea. *See, e.g.*, AR 508–10, 517–18, 537, 547, 691. Since the DLI, medical providers have continued to treat Henry D. for pain in his right foot and he has reported that the pain is worsening. *See, e.g.*, AR 634–36, 647, 881, 1081–84, 1438–40, 1461–64. Henry D. has also incurred shoulder and knee injuries since the DLI, *see, e.g.*, AR 617, 715, 1847–48, and continued to experience complications from asthma, obesity, diabetes mellitus, prostate hyperplasia, hypertension, GERD, and obstructive sleep apnea, *see, e.g.*, AR 467–68, 503–04, 547–49, 617–18, 691–93, 917–19.

B.   **Medical Opinions**

On October 10, 2014, Dr. Grady opined that as of November 26, 2012, Henry D.'s foot pain would require him to elevate his legs for half of the working day, but that he could perform low stress jobs, walk two city blocks without rest or severe pain, sit for at least six hours at a time, and stand for twenty minutes at a time. AR 817–21. On June 9, 2015, in connection with Henry D.'s appeal of the ALJ's May 2015 decision, his counsel requested the following five clarifications from Dr. Grady regarding his 2014 opinion: (1) clarify how he chose November 26, 2012 as the date Henry D.'s limitations began given that he had been treating Henry D. since 2006; (2) state whether he prescribed Henry D. with a cane; (3) clarify why Henry D. needed to elevate his feet; (4) explain what he meant by saying Henry D. was "unable to ambulate comfortably;" and (5) clarify his opinion on Henry D.'s neck limitations. AR 851–52.

On August 16, 2015, Dr. Grady responded:

1. The first time I saw this patient was December 28, 2006.
2. I have no record of prescribing a cane for this patient. I don't believe that I did.
3. The presence of the edema noted in the MRI from November 7, 2008, required at that time that he keep his leg elevated. Since that time he actually can put his foot down as long as pain doesn't force him to keep it up. The pain would be from the edema.
4. My statement that patient is 'unable to ambulate comfortably' is based on the fact that there is definitely pain when this patient ambulates and [sic] is unable to ambulate without pain.
5. I had no comment about neck movements and I believe I accidentally checked it since I couldn't find a box which said that he had no limitations.

AR 850.

On April 1, 2019, in connection with the remand, Dr. Raghavendra, one of Henry D.'s primary care physicians, opined that since 2003, he has needed to elevate his legs during periods of prolonged sitting and has been incapable of even low stress jobs, walking one city block without rest or severe pain, sitting for more than ten minutes at a time, or standing for more than five minutes at a time. AR 1883–87. On April 23, 2019, Dr. Emil Zager, another podiatrist who had treated Henry D. for two months at the time, opined that since October 2003, he has needed to elevate his legs for sixty percent of the working day and has been incapable of even low stress jobs, sitting for more than fifteen minutes at a time, or standing for more than ten minutes at a time. AR 1891–95.

At the 2019 hearing, Dr. Munoz, an impartial medical expert who specializes in family practice and occupational medicine, opined on Henry D.'s RFC after reviewing the medical evidence. AR 1095–107. Henry D.'s counsel did not object to Dr. Munoz's qualifications to testify as an expert. AR 1095–96. Dr. Munoz testified that during the relevant time, Henry D. had several severe impairments including: type 2 diabetes, tibial and sural nerve issues, asthma, a

series of nodules on the right ankle, tarsal tunnel syndrome, bilateral joint arthritis, CRPS in both lower extremities, and obesity. AR 1096–97. Dr. Munoz opined that these severe impairments limited Henry D. to the full range of sedentary work but that no evidence existed to warrant a leg elevation limitation. AR 1098, 1105–07. Dr. Munoz testified that it was unusual to instruct a patient to elevate their legs for four hours a day and that he had never done so. AR 1105–07.

## III.   Hearing Testimony

Henry D. testified at both the hearings in 2015 and at the hearing in 2019. He stated that he could not work because of the chronic pain in his right foot. AR 139, 1111–12. Henry D. testified that he has been using a prescribed cane to stand and walk since 2003. AR 58–59, 140, 1121. He testified that during the relevant time, he experienced pain, cramps, stiffness, and tingling in the bottom of his right foot. AR 149. Henry D. said he was taking multiple medications for the pain but that the medications caused complications, so he stopped taking some of them. AR 151–52. He testified that the injections he received from Dr. Grady provided him with relief, but only for about two days. AR 1117. Henry D. said he was also icing and elevating his feet to relieve the pain. *Id.* He testified that during the relevant time period, he would need to elevate his feet about four times during an eight-hour work day for about fifteen to twenty minutes at a time. AR 1116–17.

However, Henry D. said during the relevant time, he "tolerated the pain to some degree," walked on a treadmill assisted by handrails for about five minutes at a time, and walked about fifteen to twenty steps at a time outside. AR 128–29, 148, 1117, 1119, 1121. Henry D. also testified that he attended cosmetology school for approximately three months during the relevant time period to learn how to cut hair. AR 127–28. He said that in the first schooling phase, he sat for about four-and-a-half to five hours a day in a classroom. AR 1115. During this time, Henry

8

D. testified that he did not elevate his feet, but he could take breaks to freely walk around the classroom and his legs would swell at the end of the day. AR 1115–16. He said during the next schooling phase, he would stand and lean on a high stool to practice cutting hair. AR 59–60, 141.

At the hearings, impartial vocational experts ("VE") testified that given Henry D.'s limitation to sedentary work, he could not perform his past relevant work. AR 111–12, 1123–24. The VEs reported that there was unskilled sedentary work available during the relevant time period. AR 112–13, 1125. However, the VEs testified that this work would not allow employees to elevate their legs and that such a leg elevation limitation would eliminate any possible sedentary work. AR 114, 1125–26.

## IV.   The ALJ's June 2019 Decision

Following the five-step analysis used by the SSA to evaluate disability, the ALJ found at step one that Henry D. had not engaged in substantial gainful activity from his alleged disability onset date (August 15, 2008) through his DLI (June 30, 2009). AR 859. At step two, the ALJ found that Henry D.'s diabetes mellitus, obesity, sinus tarsi syndrome of the right foot, capsulitis of the right foot, obstructive sleep apnea, and tarsal tunnel syndrome of the right foot constituted severe impairments. *Id.* The ALJ found that Henry D.'s shoulder and knee problems, asthma, hypertension, GERD, and prostate hyperplasia were non-severe impairments and that his depression and anxiety were not medically determinable. AR 859–61. At step three, after considering Henry D.'s obesity and diabetes as aggravating factors, the ALJ found that his impairments did not meet or medically equal the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 861.

After considering the record, the ALJ then concluded that Henry D. had the RFC to perform the full range of sedentary work, with no leg elevation limitation. AR 862–67. At step four, the ALJ concluded that Henry D. could not perform any of his past relevant work. AR 867–68. The ALJ then proceeded to step five and found that, given Henry D.'s RFC, age, education, and work experience, a significant number of jobs existed that he could have performed during the relevant time period. AR 868. Thus, the ALJ concluded that Henry D. was not disabled within the meaning of the Social Security Act from August 15, 2008 through June 30, 2009 and denied his DIB application. AR 868–69.

## LEGAL STANDARD

### I. Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. ---, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Although the Court reviews the entire record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But the Court may reverse and remand the ALJ's decision if the ALJ committed an error of law or based her decision on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ "need not provide a complete written

evaluation of every piece of testimony and evidence," *Shideler*, 688 F.3d at 310 (citation omitted), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citation omitted).

## II.     Disability Standard

To qualify for DIB, a claimant must show that he is disabled, meaning that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the SSA uses a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4); *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the relevant period. *See* 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant's impairments are severe and meet the twelve-month durational requirement. *Id.* §§ 404.1509, 404.1520(a)(4)(ii).

At step three, the ALJ determines whether the claimant's impairment(s) meet or equal an impairment listed in the Social Security regulations. *Id.* § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App'x 1. If the claimant's impairment(s) meet or equal a listing and meet the duration requirement, the claimant is disabled; if not, the analysis continues, and the ALJ assesses the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iii), (e). At step four, the ALJ considers the claimant's RFC and determines whether the claimant can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant can perform past relevant work, he is not disabled. *Id.* If he cannot, the ALJ proceeds to step five, where the ALJ determines whether a substantial

11

number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 404.1560(c). If the claimant can perform other work, he is not disabled; if he cannot perform other work, he is disabled. *Id.* § 404.1520(a)(4)(v). The claimant bears the burden of proof at steps one through four, and the burden shifts to the government at step five. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

In seeking to overturn the ALJ's decision, Henry D. argues that the ALJ committed reversible error by failing to include a leg elevation limitation within his RFC. A claimant's RFC represents the maximum he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). An ALJ must base a claimant's RFC on all relevant evidence in the record, including the claimant's medical history and findings, the effects of treatment, reports of daily activities, and medical opinions. 20 C.F.R. § 404.1545(a)(3); SSR 96–8p, 1996 WL 374184, at *5. An ALJ's RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion" and "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96–8p, 1996 WL 374184, at *7.

Henry D. argues that the ALJ improperly gave Dr. Grady's opinion regarding leg elevation limited weight.[10] In assessing a claimant's RFC, the ALJ must determine how to weigh each medical opinion in the record. 20 C.F.R. § 404.1527(c). For claims like Henry D.'s filed before 2017, "the opinion of a treating physician is entitled to controlling weight if it is

---

[10] Henry D. begins by stating that the "ALJ provided minimal explanation for discounting [Henry D.'s] need to elevate his legs, despite the support of three treating physicians, including a longitudinally treating podiatrist, objective evidence in the record, and [Henry D.'s] own sworn testimony." Doc. 13 at 9. However, his brief focuses entirely on the ALJ's decision to give Dr. Grady's opinion limited weight. Therefore, the Court will do the same.

supported by sound medical evidence and is consistent with the record." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021); *see* 20 C.F.R. § 404.1527(c). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates*, 736 F.3d at 1100. However, if "well-supported contrary evidence" exists in the record, a treating physician's opinion is "just another piece of evidence for the ALJ to evaluate." *Karr*, 989 F.3d at 511.

Here, the ALJ adequately explained that Dr. Grady's opinion regarding Henry D.'s need to elevate his legs was not consistent with the record and was contrary to other well-supported evidence. In assessing Dr. Grady's opinion, the ALJ began by noting that even though Dr. Grady began treating Henry D. in December 2006, his first opinion stated that Henry D.'s limitations did not apply until after the DLI, in November 2012. Henry D. argues that the ALJ failed to address Dr. Grady's second opinion which clarified that Henry D. needed to elevate his legs at the time of the November 2008 MRI. However, putting the time discrepancy aside, the ALJ went on to consider whether evidence in the record during the relevant time period supported each limitation Dr. Grady suggested.[11] In relevant part, the ALJ specifically noted that he gave "some consideration" to Dr. Grady's suggested leg elevation limitation "because the record does mention [Henry D.] would elevate his legs and the medical expert testified that his [sic] may have helped his symptoms, but most of this evidence about elevating his legs comes from after the date last insured, and this potential limitation is contradicted by the physical exams where the claimant did not report having any musculoskeletal issues, was standing on his feet while working, and his symptomatic relief with treatment." AR 866. Therefore, regardless of

---

[11] Henry D. also discusses the ALJ's assessment of Dr. Grady's suggested neck and stand/walk limitations. However, because Henry D. only objects to the ALJ's decision not to include the leg elevation limitation within his RFC, the Court will not address these limitations.

the time discrepancy, it is clear the ALJ considered Dr. Grady's suggested leg elevation limitation.

Henry D. further argues that the ALJ's failure to mention Dr. Grady's opinion that the edema in his right foot in November 2008 required him to elevate his legs at that time is critical because the ALJ must explain why contrary evidence did not persuade him. However, an ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," as long as his decision is adequately articulated and supported by substantial evidence. *Shideler*, 688 F.3d at 310 (citation omitted). Here, the ALJ explicitly acknowledged that contrary evidence existed in the record and then went on to explain why this evidence did not persuade him by noting that most of it came after the DLI and by identifying contradictory evidence. This is all that is necessary. *See* 20 C.F.R. § 404.1527(c)(2); *Zblewski v. Astrue*, 302 F. App'x 488, 493 (7th Cir. 2008) (noting that an "ALJ must only 'minimally articulate' his reasoning" and finding that "[b]ecause the ALJ pointed to medical evidence that was inconsistent or insufficiently objective, the ALJ provided the 'good reasons' required for discounting [a treating physician's] testimony").

Substantial evidence also supports the ALJ's decision to discount Dr. Grady's suggested leg elevation limitation. Many treatment notes after the DLI indicate edema or swelling in Henry D.'s right foot and some indicate that leg elevation was helping to alleviate Henry D.'s pain. *See* AR 483, 486–67, 547, 647, 965–66, 1041–43, 1081–84, 1445, 1448–54, 1461–63. However, during the relevant time, no contemporaneous treatment notes mention leg elevation and only a few indicate swelling or edema in Henry D.'s right foot. AR 534, 583–84. Prior to the alleged disability onset date, the most recent report of swelling in Henry D.'s right foot was in February 2008 by his physical therapists. AR 680. However, from February 2008 through the DLI, none

14

of Dr. Grady's treatment notes mention edema/swelling or leg elevation. AR 650–59. Dr. Grady's notes during this time also continuously indicate that injections were providing Henry D. with relief. *Id.* Further, Henry D. testified that during the relevant time period, he stood with support while cutting hair, "tolerated the pain to some degree," and did not elevate his legs while sitting for a prolonged period at cosmetology school. AR 60, 141, 1115, 1117. The weight of the medical record does not support a conclusion that pain or swelling required Henry D. to elevate his legs for half of a working day during the relevant time period. Because the ALJ's decision is sufficiently articulated and supported by substantial evidence, he did not err by not specifically addressing the November 2008 swelling in Henry D.'s foot.

Henry D. also argues that the ALJ cherry-picked the record "to craft a contradiction where none exists" when pointing out that Henry D. did not report having any musculoskeletal issues during primary care visits. Doc. 13 at 12. He argues that relying on primary care visits unrelated to his foot pain to contradict Dr. Grady's opinion, while not pointing out one primary care visit in which he did report foot pain, amounts to error. However, the ALJ did not ignore that some evidence in the record supported a leg elevation limitation. Instead, he specifically acknowledged this evidence and then pointed to contradictory evidence in the record, including the numerous times in which Henry D. did not report foot issues to medical providers during the relevant time period. *See McFadden v. Berryhill*, 721 F. App'x 501, 505 (7th Cir. 2018) (finding ALJ did not cherry-pick record where she "directly confronted the evidence that contradicted her decision"). A reasonable mind could accept this, along with the other contradictory evidence cited, as adequate to support the ALJ's decision to discount Dr. Grady's suggested leg elevation limitation and therefore, substantial evidence supports the ALJ's decision. *See Karr*, 989 F.3d at

511–12 (finding that substantial evidence, including notes from the claimant's primary care provider, supported an ALJ's decision to discount a treating specialist's opinion).

Last, Henry D. argues that the ALJ did not "acknowledge or address" a majority of the required factors. Doc. 13 at 10. SSA regulations set forth multiple factors ALJs must consider when determining whether to give a treating physician's opinion less than controlling weight: "(1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see* 20 C.F.R. § 404.1527(c). In giving Dr. Grady's opinion limited weight, the ALJ only noted that Dr. Grady is a podiatrist who had treated Henry D. since 2006. The Court agrees that the ALJ should have more explicitly considered the nature and extent of Dr. Grady's treatment relationship with Henry D. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.").

However, the Court cannot find that the ALJ's failure to do so amounts to a legal error requiring reversal. If an error leaves a court "convinced that the ALJ would reach the same result on remand, then the error is harmless and a remand is not required." *Karr*, 989 F.3d at 513. As previously explained, even considering the nature and extent of Dr. Grady's treatment relationship with Henry D., substantial evidence supports the ALJ's decision to discount Dr.

16

Grady's opinion. Therefore, the Court finds this error harmless. *See id.* at 512–13 (finding harmless error in ALJ's failure to "march[] through the factors referenced in § 404.1527(c)(2)" where substantial evidence supported his decision to discount a treating physician's opinion).

Henry D. also argues that none of the factors support giving Dr. Munoz's opinion greater weight than Dr. Grady's. However, "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Apke v. Saul*, 817 F. App'x 252, 256 (7th Cir. 2020) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001)). The ALJ adequately explained that he gave Dr. Munoz's opinion great weight because it was consistent with and supported by the record. Because substantial evidence supports that decision, the ALJ did not err in giving Dr. Munoz's opinion regarding a leg elevation limitation greater weight than Dr. Grady's.

## CONCLUSION

For the foregoing reasons, the Court affirms the ALJ's decision to deny Henry D.'s application and enters judgment in favor of the Commissioner and against Henry D.

Dated: May 4, 2021

SARA L. ELLIS
United States District Judge